**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-23266-CIV-BLOOM/OTAZO-REYES**

JUAN C. ZUNIGA,

     Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

     Defendant.

_____/

**REPORT AND RECOMMENDATION**

THIS CAUSE is before the Court upon Plaintiff Juan C. Zuniga's ("Claimant") Motion for Summary Judgment with Brief in Support of Remanding the Case to the Commissioner of Social Security (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 17] and Defendant Kilolo Kijakazi Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 18]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 12].[1] For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

**PROCEDURAL HISTORY**

Claimant filed an application for supplemental security income ("SSI") and an application for disability insurance benefits ("DIB") on August 13, 2020, alleging a disability onset date of

---

[1] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

January 1, 2020.  TR. 30.  The applications were denied initially and upon reconsideration.  Id.

Upon Claimant's written request, a hearing was held on December 10, 2021, before Administrative

Law Judge Norman Hemming ("ALJ Hemming"), at which Claimant and Vocational Expert

Nicholas S. Fidanza ("VE Fidanza") testified.  Id. at 49–85.

On December 28, 2021, ALJ Hemming issued an Unfavorable Decision, finding the

following:

(1) Claimant met the insured status requirements of the Social Security Act through
December 31, 2023.  Id. at 32.

(2) Claimant had not engaged in substantial gainful activity since January 1, 2020,
the alleged onset date (20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).  Id.

(3) Claimant had the following severe impairments: glaucoma; cataract in the right
eye; status post left eye surgeries; retinopathy; branch retinal vein occlusion in
the left eye; loss of visual acuity; bipolar disorder; and anxiety disorder (20
C.F.R. §§ 404.1520(c) and 416.920(c)).  Id.

(4) Claimant did not have an impairment or combination of impairments that met
or medically equaled the severity of one of the listed impairments in 20 C.F.R.
Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525,
404.1526, 416.920(d), 416.925, and 416.926).  Id. at 33.[2]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform
medium work with certain non-exertional limitations.  Id. at 34–35.[3]

(6) Claimant was capable of performing past relevant work as a security guard,
meat grader, bus person, and supervisor.  (20 C.F.R. §§ 404.1565 and 416.965).
Id. at 41.[4]

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major
body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from
doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§
404.1525(a) and 416.925(a).

[3] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite
the claimant's limitations or impairments.  See 20 C.F.R. § 416.945(a)(1).  The RFC must be determined
based on all of the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§
416.920 and 416.945.

[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful
activity, and that lasted long enough for you to learn to do it."  20 C.F.R. §§ 404.1560(b)(1) and
416.960(b)(1).

(7)   Claimant had not been under a disability, as defined in the Social Security Act, from January 1, 2020, through the date of the decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).  Id. at 42.

On September 2, 2022, the Appeals Council denied a request for review of ALJ Hemming's Unfavorable Decision.  Id. at 1–8.  On October 7, 2022, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Hemming's final administrative decision [D.E. 1].

In support of his contention that ALJ Hemming's Unfavorable Decision should be reversed, Claimant argues that:

I.   The only past relevant work identified by the vocational expert as consistent with all the limitations of the ALJ's RFC was never performed by [Claimant]. Specifically, the *bus person (restaurant)* job was identified in error as past work performed.

See Claimant's Motion for Summary Judgment [D.E. 17] (emphasis in original).  The undersigned does not find merit in this contention.

## RELEVANT MEDICAL EVIDENCE

### I.  Physical Health Providers

#### A.  Treating Sources

##### 1)  Community Health of South Florida

On October 26, 2020, Claimant presented to Community Health of South Florida for a vision screening, which was conducted by John K. Fusselman, O.D. ("Dr. Fusselman").  TR. 546. The vision screening revealed that Claimant had a nuclear senile cataract in his right eye; and a pseudophakia in his left eye.  Id.[5]  Dr. Fusselman noted that Claimant's intraocular pressure was elevated in both of his eyes and prescribed Claimant medication to treat and manage open-angle glaucoma and ocular hypertension.  Id.  Dr. Fusselman informed Claimant of the importance of

---

[5] A pseudophakia is an artificial lens that is implanted in the eye during cataract surgery to replace the eye's natural lens.  See https://www.healthline.com/health/pseudophakia.  Claimant had undergone cataract surgery in his left eye in May 2012.  TR. 36, 462.

going to a specialist for a glaucoma workup; and recommended that he return to the clinic in one month to check his intraocular pressure.  Id.

On December 11, 2020, Claimant presented for an annual examination and was seen by Vanessa Villacorta Sierra, M.D. ("Dr. Sierra").  Id. at 536.  Dr. Sierra noted that Claimant's body mass index ("BMI") was in the range for obesity.  Id. at 538.  However, Claimant's cardiovascular and musculoskeletal functions were normal.  Id. at 539.

On January 26, February 24, March 23, and April 7, 2021, Claimant presented for various follow-up appointments.  Id. at 497, 505, 510, 682.  At these appointments, providers noted Claimant's elevated BMI, id. at 499, 506, 511, 683, and educated Claimant about a proper diet, id. at 500, 508, 512, 684.

### 2) Occupational Medical Center

On November 6, 2020, Claimant presented to Occupational Medical Center for a disability examination.  Id. at 487.  Claimant was seen by Rosanna Perez, M.D. ("Dr. Perez").  Id. at 490. Dr. Perez noted Claimant's allegations of disability due to mental problems, high blood pressure, and headaches.  Id. at 487.  Claimant reported that he had been diagnosed in August 2020 with bipolar disorder but had experienced alternating periods of anxiety and depression for the past 15 years.  Id.  Claimant stated that he had persistent insomnia but denied depressive symptoms and suicidal or homicidal thoughts and noted that he attended monthly follow-up visits with his psychiatrist since his diagnosis.  Id.

Claimant gave a history of high blood pressure since 2019 and admitted that he did not comply with his prescribed treatment regimen for it.  Id.  Claimant experienced headaches two to three times per week due to his high blood pressure.  Id.  He reported that he was able to dress and feed himself; lift a gallon of milk and climb one flight of stairs; and perform household chores

such as sweeping, mopping, vacuuming, cooking, cleaning dishes, and shopping.  Id.  Claimant denied having problems standing, sitting, or walking and confirmed that he did not drive.  Id.  Claimant also gave a past medical history of glaucoma; and denied the use of tobacco, alcohol, or recreational drugs.  Id. at 487–88.  He stated that he was single, did not have children, and lived alone in an apartment.  Id. at 488.

Apart from confirming Claimant's history of anxiety and vision problems due to glaucoma, a review of systems was normal.  Id.  A physical examination revealed that Claimant's visual acuity was 20/30 in the right eye and 20/30 in the left eye with corrective lenses; and that his horizontal fields were full at 85 degrees bilaterally.  Id.  Claimant was well-developed and well-nourished; he was not in apparent distress; and he exhibited satisfactory eye contact, communication, cooperation, and participation.  Id.  Further, Claimant's musculoskeletal and neurological functions were intact.  Id. at 489.  Claimant's affect was normal; his conversation was coherent; he denied any current hallucinations, delusions, and overt suicidal or homicidal ideations; his memory was grossly intact; and his calculation and cognitive functions, abstraction, and executive functions appeared to be commensurate with his age, socioeconomic status, and education.  Id. at 489–90.  Testing was not performed.  Id. at 490.

Dr. Perez's diagnostic impressions consisted of the following: history of bipolar disorder, essential hypertension (non-compliance); and history of glaucoma.  Id.  She advised Claimant to follow up with his primary care physician regarding his high blood pressure.  Id. at 491.

### 3)  Med Eye Associates

On January 15, 2021, Claimant presented to Med Eye Associates for an evaluation of his open-angle glaucoma and was seen by Sanjay Smith, M.D. ("Dr. Smith").  Id. at 621, 812.  Claimant reported that his glaucoma had started three years prior; that the onset had been gradual;

and that it affected his peripheral vision.  Id.  The chart note indicated that Claimant's condition was significant.  Id.  Claimant reported that, although he had undergone cataract surgery, the vision in his left eye was "not good still"; and the vision in his right eye was blurry.  Id.  Claimant also reported that he occasionally had dry eyes and mild floaters in both of his eyes; and that he used eye drop medication to treat and manage his open-angle glaucoma and ocular hypertension.  Id.  Claimant denied eye pain and headaches.  Id.  A review of systems and physical examination were normal.  Id. at 622, 624, 813, 815.

An examination of Claimant's eyes revealed that he had 20/40 vision, vitreous floaters, and attenuated retinal vessels in both of his eyes.  Id. at 624, 815.  Dr. Smith's diagnostic impressions were that Claimant had: glaucoma in both eyes; a stable superior field defect with generalized loss of visual field in both eyes; and tributary (branch) retinal vein occlusion in the left eye with macular edema.  Id. at 626, 817.  Dr. Smith assessed Claimant with severe bilateral primary open-angle glaucoma; age-related cataract in the right eye; bilateral vitreous membranes and strands; and bilateral hypertensive retinopathy.  Id. at 627, 818.  He further noted the presence of an intraocular lens in Claimant's left eye.  Id.  Dr. Smith discontinued Claimant's prior eye drop medication and prescribed a new eye drop medication for use in both eyes; and recommended that Claimant follow up with him in a few weeks' time.  Id. at 628, 819.

On March 5, 2021, Claimant presented for a follow-up appointment with Dr. Smith.  Id. at 615, 806.  Claimant reported that his eyesight was consistently blurry, and that it was worse in his right eye.  Id.  Dr. Smith noted that Claimant's condition was improving, although his intraocular pressure needed to be lower; and prescribed Claimant an additional eye drop medication.  Id. at 619–20, 810–11.

On March 19, 2021, Claimant presented for an evaluation of the branch retinal vein

occlusion in his left eye and was seen by Zachary K. Segal, M.D. ("Dr. Segal"). Id. at 607, 798. Dr. Segal noted that Claimant's condition was moderate and constant. Id. An examination revealed that Claimant had vitreous floaters in his right eye, a vitreous hemorrhage in his left eye, and branch retinal vein occlusion with cystoid macular edema in his left eye. Id. at 610, 801. Dr. Segal recommended that Claimant undergo surgery in his left eye to treat his condition; and Claimant accepted. Id. at 612, 803.

On April 15, 2021, Claimant had surgery in his left eye, performed by Dr. Segal. Id. at 577, 605. Claimant's preoperative diagnoses were a non-clearing vitreous hemorrhage of the left eye, and a tributary vein occlusion of the left eye. Id. at 577. Claimant underwent a trans-pars plana vitrectomy and endolaser panretinal photocoagulation; and received a sub-tenon Kenalog steroid injection in his left eye. Id. Claimant did not suffer any complications. Id. at 577–78.

On April 23, 2021, Claimant presented for a post-operative appointment with Dr. Segal. Id. at 593, 786. Claimant's vision had been corrected to 20/50 in both eyes, although his eye conditions persisted. Id. at 594, 597, 788, 790. Claimant was advised to continue his treatment regimen, including recently prescribed corticosteroid and antimicrobial eye drop medications. Id.

On May 7, 2021, Claimant presented for a follow-up appointment with Dr. Segal. Id. at 587, 780. Claimant reported that his symptoms had improved since the surgery, although the vitreous hemorrhage in his left eye persisted. Id. at 591, 784. Dr. Segal recommended that Claimant decrease the use of his eye drop medications and that he report any worsening of his symptoms. Id.

On May 11, 2021, Claimant presented for an evaluation of the intraocular pressure in his eyes and was seen by Dr. Smith. Id. at 581, 774. Claimant reported no changes since his previous visit. Id. However, the intraocular pressure in Claimant's left eye was elevated. Id. at 585, 778.

As a result, Dr. Smith adjusted Claimant's medication, which included commencing new eye drop medications and restarting a previously discontinued eye drop medication.  Id.

On June 1, 2021, Claimant presented for a follow-up appointment and was seen by Dr. Smith.  Id. at 768.  Dr. Smith noted that the intraocular pressure in Claimant's left eye was "still too high", and that Claimant had minimal retinal nerve fiber layer thinning in both of his eyes.  Id. at 772.  Dr. Smith recommended that Claimant continue with his medications until he was able to undergo further surgery.  Id.

On June 15, 2021, Dr. Smith provided a treating source statement wherein he wrote that Claimant had "severe glaucoma with loss of peripheral vision in both eyes" and confirmed that Claimant was taking eye drop medications to manage his glaucoma and ocular hypertension.  Id. at 631.

On June 25, 2021, Claimant presented for a follow-up appointment and was seen by Dr. Smith.  Id. at 762.  Dr. Smith noted that Claimant's intraocular pressure had likely spiked due to Claimant's use of steroid medication.  Id. at 766.  Claimant was otherwise advised to continue his treatment regimen.  Id.

On July 19, 2021, Claimant was evaluated by Robert Ortiz, O.D. ("Dr. Ortiz") for an eyeglass prescription.  Id. at 755.  Claimant had 20/25 vision in both eyes; and was assessed with presbyopia, bilateral astigmatism, and bilateral myopia.  Id. at 760.

On September 10, 2021, Claimant presented for an appointment to address his blurry vision and was seen by Dr. Segal.  Id. at 747.  Claimant had bilateral hypertensive retinopathy and some bilateral scattered vitreous opacities located temporally to the nerve; but he did not have any retinal detachment, retinal tears, or masses present.  Id. at 752.  Dr. Segal advised that Claimant return to the office if he experienced an increase in flashes, floaters, or constriction of peripheral field.  Id.

On October 6, 2021, Claimant underwent a bimatoprost intracameral implant in his left eye.  Id. at 741.  Dr. Segal advised Claimant to discontinue the use of one of his eye drop medications in his left eye; and continue the use of another eye drop medication in both of his eyes.  Id. at 745.

### B.  Non-treating Sources

#### 1)  State Agency Physician Roland Gutierrez, M.D. ("Dr. Gutierrez")

On November 13, 2020, Dr. Gutierrez completed a medical evaluation of Claimant at the initial level.  Id. at 86, 97.  Dr. Gutierrez noted that Claimant filed his claim for disability due to his mental state, high blood pressure, anxiety, bipolar disorder, vision problems, and headaches. Id. at 87, 98.  However, Dr. Gutierrez ultimately opined that Claimant's "physical impairments [were] not severe to the point of causing functional limitations that preclude substantial gainful activity."  Id. at 91, 102.

#### 2)  State Agency Physician Thomas Bixler, M.D. ("Dr. Bixler")

On May 26, 2021, Dr. Bixler completed an RFC assessment of Claimant at the reconsideration level.  Id. at 121.  Dr. Bixler opined that Claimant had the following exertional limitations: occasionally lifting and/or carrying (including upward pulling) 50 pounds; frequently lifting and/or carrying (including upward pulling) 25 pounds; standing and/or walking and sitting (with normal breaks) total of about 6 hours in an 8-hour workday; and pushing and/or pulling (including operation of hand and/or foot controls) unlimited amount.  Id. at 121–22.  Dr. Bixler further opined that Claimant did not have any postural, manipulative, visual, communicative, or environmental limitations.  Id. at 122.  Dr. Bixler concluded that Claimant's "physical impairments [were] not severe to the point of causing functional limitations that preclude substantial gainful activity."  Id. at 123.

## II. Mental Health Providers

### A. Treating Sources

#### 1) Community Health of South Florida

On August 4, 2020, Claimant presented via Telehealth to Community Health of South Florida for a psychiatric evaluation.  Id. at 572, 737.  Claimant was evaluated by Beatriz D'Onghia, M.D. ("Dr. D'Onghia").  Id.  Claimant reported that he was 51 years old and was experiencing a depressed mood.  Id.  He also reported decreased sleep, decreased energy, good appetite, and low motivation; and denied anhedonia, suicidal or homicidal thoughts, perceptual disturbances, and fainting.  Id.  Claimant stated that he had anxiety, headaches, mood swings, and racing thoughts; that he was worried about the future; and that he was impulsive and irritable for days at a time.  Id.  Claimant gave a medical history of hypertension and glaucoma; denied having a past psychiatric history; and denied a history of abuse.  Id.  He stated that he was born in Nicaragua; that he was single; that he did not have children; that he lived with his mother; and that he was financially supported by his family.  Id.

Claimant's weight was stable; he was not in any pain; and he reported that he went to the gym.  Id. at 573, 738.  He was casually dressed and exhibited normal grooming and hygiene.  Id.  He was cooperative and coherent, and his affect was reactive and mood congruent.  Id.  He did not display any unusual movements or psychomotor changes; he had good eye contact; his thought process was goal-directed and logical; he was oriented and alert; his insight and judgment were fair; and his memory and concentration were intact.  Id.  However, he was anxious.  Id.

Dr. D'Onghia diagnosed Claimant with bipolar II disorder and anxiety disorder.  Id. at 574, 739.  She instructed Claimant to commence a treatment plan consisting of antipsychotic and antihistamine medications; and recommended that Claimant regularly follow up with his primary

care provider.  Id.  Dr. D'Onghia further recommended that Claimant attend therapy.  Id.

On August 24, 2020, Claimant presented over the telephone for a medication management appointment with Dr. D'Onghia.  Id. at 570, 735.  Claimant reported that he was taking his medications every day and denied having any side effects.  Id.  Claimant further reported that he was feeling a little better, with less anxiety, but still experienced racing thoughts and decreased sleep.  Id.  Dr. D'Onghia directed Claimant to continue taking the proper dosage of his antipsychotic medication; and increased the dosage of Claimant's antihistamine medication.  Id.

On September 22, 2020, Claimant presented over the telephone for a medication management appointment with Dr. D'Onghia.  Id. at 558, 568, 733.  Claimant reported that his mood was better but that he was still struggling with his sleep and racing thoughts.  Id.  Dr. D'Onghia increased the dosage of Claimant's antipsychotic medication; and noted that Claimant was improving.  Id. at 558–59, 568–69, 733–34.

On October 15, 2020, Claimant presented over the telephone for a medication management appointment with Dr. D'Onghia.  Id. at 556, 566, 731.  Claimant's condition was largely unchanged from his prior appointment.  Id.  Dr. D'Onghia increased the dosage of Claimant's antipsychotic and antihistamine medications; and prescribed him a selective serotonin reuptake inhibitor ("SSRI") medication.  Id.

On November 17, 2020, Claimant presented over the telephone for a medication management appointment with Dr. D'Onghia.  Id. at 554, 729.  Claimant reported feeling less anxious but still irritable at times.  Id.  He was stressed about the location of some of his belongings, but was otherwise sleeping well, and denied having racing thoughts.  Id.  Dr. D'Onghia increased the dosages of Claimant's antihistamine and SSRI medications.  Id.

On December 17, 2020, Claimant presented over the telephone for a medication

management appointment with Dr. D'Onghia.  Id. at 552, 727.  Claimant reported feeling better, less depressed, with fewer racing thoughts, and better sleep.  Id.  Dr. D'Onghia increased the dosage of Claimant's SSRI medication.  Id.

On January 19, 2021, Claimant presented over the telephone for a medication management appointment with Dr. D'Onghia.  Id. at 725.  Claimant reported that he was feeling better, that he was less depressed, and that his sleep was good.  Id.  He also denied having mood swings.  Id.  Dr. D'Onghia directed Claimant to continue taking the same dosages of his medications.  Id.

On April 5, 2021, Claimant presented over the telephone for a medication management appointment with Dr. D'Onghia.  Id. at 723.  Claimant stated that he was doing well and sleeping well.  Id.  He also denied feeling depressed, anxious, or agitated.  Id.  Once more, Dr. D'Onghia directed Claimant to continue taking the same dosages of his medications.  Id.

On June 21, 2021, Claimant presented over the telephone for a medication management appointment with Dr. D'Onghia.  Id. at 721.  Claimant reported that he was doing well in general, but that he was having some problems sleeping.  Id.  Claimant agreed to try a new antidepressant, in addition to continuing his other medications.  Id.

On August 16, 2021, Claimant presented for a medication management appointment with Dr. D'Onghia.  Id. at 718.  Claimant reported that he was sleeping better, that he was not depressed, and that he did not have mood swings.  Id.  However, he stated that he still felt anxious at night.  Id.  Dr. D'Onghia adjusted the dosage of Claimant's antidepressant medication.  Id.

### B.  Non-treating Sources

#### 1)  State Agency Psychologists Jennifer Meyer, Ph.D. ("Dr. Meyer") and Richard K. Lyon, Ph.D. ("Dr. Lyon")

On October 22, 2020, and May 26, 2021, respectively, Dr. Meyer and Dr. Lyon evaluated Claimant's mental medically determinable impairments.  Id. at 92, 103, 117, 134.  Drs. Meyer and

Lyons opined that Claimant's depression and anxiety disorders contributed to mild limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  Id. at 93, 104, 118, 135.  They further opined that Claimant did not have any limitations in understanding, remembering, or applying information.  Id.

## HEARING TESTIMONY

A hearing was held on December 10, 2021, before ALJ Hemming, at which Claimant and VE Fidanza testified.  Id. at 49–85.

### I.     Claimant

Claimant testified that he was 52 years old, 5'7" tall, and weighed approximately 193 pounds.  Id. at 55.  He testified that the highest level of education that he completed was high school, having graduated from Miami Coral Park Senior High; and that he did not have any certifications.  Id. at 55–56.

Claimant testified that he had worked at Gables Plaza Condominium as a security guard, which had involved walking around and sitting at a desk.  Id. at 56.  He stated that the heaviest thing he had had to lift or carry as a security guard weighed four to five pounds.  Id. at 57.  Claimant also testified that he had worked for Hampton Inn as a delivery driver, which had involved driving a delivery van and lifting or carrying about 25 pounds while making deliveries.  Id.  Claimant had also worked at three companies as a meat inspector, which had involved monitoring a conveyor belt and lifting or carrying about 20 pounds while working.  Id. at 57–61.  Claimant testified that he had also worked as an unofficial supervisor at the HTH Company, which had involved supervising around five employees while they power washed items; and lifting or carrying about 10 pounds.  Id. at 58–59.  Claimant further testified that he had worked at Fuji Steakhouse, which had involved "see[ing] that all the table was organized and they have everything that they need for

the customer"; "[m]ak[ing] sure the table was in order"; "putting out plates, knives, forks, [and] glasses"; and lifting or carrying plates that weighed one to two pounds each. Id. at 60–61. Finally, Claimant testified that he worked at Harbor Freight Tools transporting items from the store to customers in their cars. Id. at 62–63. He clarified that he had performed this job on a part-time basis and that his eye condition had not permitted him to work full time, causing him to leave the job. Id. at 63. Accordingly, ALJ Hemming informed VE Fidanza that this job was not to be considered as past relevant work. Id.

Claimant confirmed that he had glaucoma in both eyes, although it was worse in his left eye, and that he was taking medication to manage the pressure in his eyes. Id. at 64. He testified that he wore glasses, that he had 20/50 vision in both eyes, and that he had problems with his peripheral vision. Id. at 65. He further testified that he was unable to work because of his anxiety and headaches that lasted five to six hours, although he did take medication to manage his headaches. Id. at 66. On a scale from 1 to 10, Claimant rated that the pain from his migraines was about a 5 or 6. Id. at 67. Claimant also testified that he had a problem with the retina in his left eye. Id.

Claimant stated that he lived alone. Id. He testified that on a typical day, he woke up, ate breakfast, listened to the news on the radio, ate lunch, laid down during the afternoon, and made dinner. Id. He did not read or use social media. Id. Claimant confirmed that all of his appointments were virtual. Id. at 68. He further testified that his mother visited him and cleaned and cooked for him; and that he traveled by bus to the grocery store about once a week. Id. at 68–69. Claimant testified that, although he had a driver's license, he did not drive due to his blurry vision and fear of getting into an accident. Id. at 70–71. He testified that he did not do anything for fun; that he attended church with his mother when she took him; and that his mother paid his

bills given that he was unemployed.  Id. at 71–73.

Claimant testified that he experienced blurry vision a couple of times a day for 30 minutes at a time.  Id. at 74.  These episodes were accompanied by eye pain, which Claimant rated at a 6 or 7 out of 10, and a loss of peripheral vision.  Id. at 75.  Claimant confirmed that he took eye drops to manage his symptoms.  Id.  Claimant testified that the loss of his peripheral vision made it difficult to complete ordinary things.  Id.  He further testified that he had problems sleeping; and that he was being treated for bipolar disorder, which caused headaches and affected his willingness to do things.  Id. at 75–76.  He added that he had racing thoughts almost every day; that he struggled to concentrate on simple things; and that he barely interacted with anybody besides his mother and brother.  Id. at 76.  Claimant testified that he was taking several medications to treat his bipolar disorder; and that he spent four or five days a week in bed.  Id. at 76–77.

## II.   VE Fidanza

VE Fidanza classified Claimant's prior work as follows:

➢ Security guard, DOT #372.667-034, with an exertional level of light,[6] and a Specific Vocational Preparation (hereafter, "SVP") of 3;[7]

➢ Van driver, DOT #913.663-018, with an exertional level of medium,[8] and an SVP of 3;

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

[7] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
An SVP of 3 means that preparation for the job should take "[o]ver 1 month up to and including 3 months." Id.

[8] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c) and 416.967(c)

➢ Meat grader, DOT #529.687-106, with an exertional level of light, and an SVP of 3;

➢ Bus person, DOT #311.677-018, with an exertional level of medium, and an SVP of 2;[9] and

➢ Supervisor, DOT #699.137-010, with an exertional level of light, and an SVP of 7.[10]

Id. at 78–79.

ALJ Hemming posed to VE Fidanza three hypotheticals for an individual of Claimant's age, with his education and work experience who:

➢ was able to function at the medium exertional level; could have unlimited exposure to all environmental limitations except only occasional exposure to hazards, fumes, and pulmonary irritants; could have unlimited exposure to supervisors, but only frequent exposure to coworkers and the general public; and had occasional use of peripheral vision in his left eye and frequent use of peripheral vision in the right eye.  (Hypothetical No. 1).

➢ had the same limitations as the individual in Hypothetical No. 1; and was further limited to simple, routine, repetitive tasks in an environment that's relatively static, meaning infrequent, no more than occasional changes, that could be explained.  (Hypothetical No. 2).

➢ had the same limitations as the individual in Hypothetical No. 2; and was further limited to working for six hours of an eight-hour workday, because for the remaining two hours, the individual needed to lie down and be in a dark room due to issues resulting from migraines and blurring/opaque vision.  (Hypothetical No. 3).

Id. at 79–80.

VE Fidanza testified that the individual in Hypothetical No. 1 would be able to perform

---

[9] An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month."   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[10] An SVP of 7 means that preparation for the job should take "[o]ver 2 years up to and including 4 years." Id.  However, VE Fidanza testified that he had "extreme doubt" that Claimant performed his job as a supervisor at the SVP 7 level, and that it was more likely that he performed it at an SVP level of 4 or 5. TR. 78–79.  An SVP of 4 means that preparation for the job should take "[o]ver 3 months up to and including 6 months"; and an SVP of 5 means that preparation for the job should take "[o]ver 6 months up to and including 1 year."   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

Claimant's past work as a security guard, meat grader, bus person, and supervisor; and that the individual in Hypothetical No. 2 would be able to perform Claimant's past work as a bus person. Id. at 79–80. However, VE Fidanza testified that the individual in Hypothetical No. 3 would be unable to perform Claimant's past work or work in the national economy that exists in significant numbers. Id. at 80–81.

Claimant's counsel posed hypotheticals to VE Fidanza for an individual who:

➢ had the same limitations as the individual in Hypothetical No. 2 and further did not have peripheral vision (Hypothetical No. 4).

➢ had the same limitations as the individual in Hypothetical No. 4 and further missed three days of work per month (Hypothetical No. 5).

Id. at 81–82. VE Fidanza testified that the individual in Hypothetical No. 4 would be able to perform Claimant's past work as a bus person; and that the individual in Hypothetical No. 5 would be unable to maintain competitive employment. Id. VE Fidanza further confirmed that an inability to drive would only affect Claimant's past work as a van driver. Id. at 82.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011). Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted). However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed

valid."  Williams, 416 F. App'x at 862.

### REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Hemming determined that Claimant had not engaged in SGA since January 1, 2020, the alleged onset date.  TR. 32.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Hemming found that Claimant suffered from the following severe impairments: glaucoma; cataract in the right eye; status post left eye surgeries; retinopathy; branch retinal vein occlusion in the left eye; loss of visual acuity; bipolar disorder; and anxiety disorder.  TR. 32.  ALJ Hemming then proceeded to step three.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Phillips, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  Id.  Here, ALJ Hemming determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. at 33.  Therefore, ALJ Hemming proceeded to step four.

Step four is a two-pronged process, which first requires the determination of a claimant's

RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work." Phillips, 357 F.3d at 1238. As to the first prong, ALJ Hemming determined that Claimant had the RFC to:

> perform medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(c) except that he has non-exertional limitations. Specifically, the claimant is unlimited in his abilities to tolerate exposure to all environmental factors, except that he is limited to occasional exposure to hazards, fumes, and pulmonary irritants. He can have unlimited exposure to supervisors, but can have only frequent exposure to coworkers and the general public. The claimant can occasionally use peripheral vision in the left eye and can frequently use peripheral vision in the right eye. He is limited to simple, routine, and repetitive task[s] in an environment that is relatively static, meaning infrequent, no more than occasional changes that can be explained.

TR. 34–35. Based on Claimant's RFC, ALJ Hemming moved to prong two of step four and concluded that Claimant was able to perform past relevant work as a security guard, meat grader, bus person, and supervisor. Id. at 41.

As a result, ALJ Hemming did not proceed to the fifth and final step;[11] and concluded that Claimant was not under a disability, as defined in the Social Security Act, from January 1, 2020, through the date of the Unfavorable Decision. Id. at 42.

## DISCUSSION

As noted above, Claimant argues that:

I.   The only past relevant work identified by the vocational expert as consistent with all the limitations of the ALJ's RFC was never performed by the [Claimant]. Specifically, the *bus person (restaurant)* job was identified in error as past work performed.

See Claimant's Motion for Summary Judgment [D.E. 17] (emphasis in original). The undersigned does not find merit in this contention.

---

[11] If the claimant cannot perform any past relevant work, step five requires the ALJ to show that the claimant has the ability to perform work that is available in significant numbers in the national economy, considering his RFC, age, education, and work experience, in order to find the claimant not disabled. Phillips, 357 F.3d at 1239–40.

I.     **Whether ALJ Hemming's decision was based on an erroneous identification of Claimant's past work.**

Claimant argues that ALJ Hemming's decision should be remanded because: (1) VE Fidanza did not testify that Claimant could perform all his past work despite the limitations set forth in the RFC; (2) Claimant has never performed the job of "bus person"; and (3) there was an apparent inconsistency between VE Fidanza's testimony and the job that, in Claimant's estimation, better approximates his past work.  See id. at 3–4, 7.

As to Claimant's first point, the Commissioner concedes that ALJ Hemming incorrectly found that "a person of the [C]laimant's same age, education, work experience, and residual functional capacity could perform the [C]laimant's past work as a security guard, meat grader, bus person, and supervisor."  TR. 42; see also Commissioner's Motion for Summary Judgment [D.E. 18 at 5 n.3].  This finding was erroneous given that VE Fidanza testified, based on Hypothetical No. 2, that an individual with Claimant's RFC would only be able to perform his past work as a bus person.  TR. 80.  Nevertheless, given that ALJ Hemming's finding did include Claimant's past work as a bus person, which "continue[d] to fall within the parameters of [Hypothetical No. 2]," id., the undersigned finds that ALJ Hemming's reference to other, ineligible past work was harmless error.  See, e.g., Elliott v. Comm'r of Soc. Sec., No. 2:16-cv-788-FtM-CM, 2017 WL 5248420, at *5 (M.D. Fla. Nov. 13, 2017) ("Given the ALJ's hypotheticals and the VE's testimony, the ALJ's error as to Plaintiff's ability [to] perform her past relevant work, if any, was harmless.").

Claimant's second point is that he "unequivocally never performed the job of *bus person*." See Claimant's Motion for Summary Judgment [D.E. 17 at 4] (emphasis in original).  Claimant contends that the description of his employment as a "cook assistant" in his Work History Report, see TR. 423, from which the classification of bus person was gleaned "do[es] not even remotely resemble the description of 'bus person' as found in the DOT".  See Claimant's Motion for

Summary Judgment [D.E. 17 at 5].  According to Claimant, his role as a cook assistant more closely resembles the DOT title for "cook helper", see DOT #317.687-010; thus, Claimant argues that VE Fidanza's "testimony that [Claimant] can perform a job he never performed is not substantial evidence supporting [ALJ Hemming's] decision, precluding meaningful judicial review."  See Claimant's Motion for Summary Judgment [D.E. 17 at 6].

In response, the Commissioner argues that "[Claimant's] attorney never questioned [VE Fidanza] [about] whether the job of bus person was incorrectly identified or sought to otherwise clarify with [VE Fidanza] why he identified [Claimant's] past work as a bus person", thereby inviting any alleged error by ALJ Hemming.  See Commissioner's Motion for Summary Judgment [D.E. 18 at 7].

The Commissioner further argues that, in any event, VE Fidanza "has a better understanding of how to identify jobs based on the requisite tasks or requirements" and did not err in classifying Claimant's past work as that of a bus person.  Id. at 8.  In this regard, the Commissioner notes that VE Fidanza's classification was based, in part, on Claimant's own testimony at the hearing.  Id. at 8–9.  Claimant testified that his job had involved "see[ing] that all the table was organized and they have everything that they need for the customer"; "[m]ak[ing] sure the table was in order"; "putting out plates, knives, forks, [and] glasses"; and lifting or carrying plates that weighed one to two pounds each.  TR. 60–61.  VE Fidanza then classified this work as follows: bus person, DOT #311.677-018, with an exertional level of medium, and an SVP of 2.  Id. at 78.  The DOT specifies that a bus person "[p]erforms any combination of [the] following duties to facilitate food service", which include "set[ting] tables with silverware and glassware"; "[r]eplenish[ing] supply of . . . silverware, glassware, and dishes in dining room"; and "transfer[ring] . . . dishes".  See DOT #311.677-018.  Given that this description accords with

Claimant's testimony of the work that he performed, VE Fidanza did not err in his classification, and ALJ Hemming did not err in relying on VE Fidanza's testimony.  See Pineda v. Comm'r of Soc. Sec., No. 6:18-cv-1569-Orl-CEM-DCI, 2019 WL 9047176, at *5 (M.D. Fla. Oct. 16, 2019) ("There is nothing to show a misclassification. So, while Claimant tries to create an apparent conflict, the undersigned finds that there was no discrepancy between the VE's testimony and the DOT.").[12]

As to his third point, Claimant posits that consideration of the cook helper job generates a conflict that ALJ Hemming was obligated to resolve primarily because the role requires near visual acuity, which Claimant does not possess.  See Claimant's Motion for Summary Judgment [D.E. 17 at 7].  However, as noted by the Commissioner, VE Fidanza did not testify as to this DOT title; hence, Claimant cannot manufacture a conflict between nonexistent expert testimony and the DOT.  See Commissioner's Motion for Summary Judgment [D.E. 18 at 10 n.4].  Moreover, Claimant effectively abandoned this theory by not mentioning it in his Reply [D.E. 19].  See Cortaza v. Kijakazi, No. 20-CV-23705, 2023 WL 2165149, at *4 (S.D. Fla. Feb. 3, 2023) ("[A] party's failure to meaningfully respond to the opposing party's responsive counterarguments constitutes a concession of the counterargument's persuasiveness.").

Having found no merit in Claimant's contentions, the undersigned concludes that ALJ Hemming's decision was indeed supported by substantial evidence and not subject to remand as

---

[12] Moreover, Claimant's reliance on Weeks v. Comm'r of Soc. Sec. Admin., No. 21-14320-CIV, 2022 WL 18023497 (S.D. Fla. Sept. 22, 2022) is misplaced.  See Reply [D.E. 19 at 4].  In Weeks, "the ALJ did not ask Plaintiff [during the hearing] anything about his past work history or duties performed."  Weeks, 2022 WL 18023497, at *11.  In evaluating the ALJ's treatment of discrepancies between the vocational expert's classification and the evidence of record, the Weeks court determined that "[a]t minimum, the ALJ should have asked Plaintiff about his past relevant work at the hearing in order to make an informed decision about relying on the particular DOT job description upon which he ultimately relied."  Id. at *13.  The Weeks court further found that "[t]o simply rely on the VE's testimony in the face of pertinent contradictory information in the record about Plaintiff's past relevant work history constitutes reversible error."  Id.  However, here, ALJ Hemming did ask Claimant about his past relevant work, and the resulting testimony supports his decision to accept VE Fidanza's classification and find that Claimant could perform some past relevant work in accordance with his RFC.  TR. 42.

argued by Claimant.  See Curcio v. Comm'r of Soc. Sec., 386 F. App'x 924, 925 (11th Cir. 2010) ("If the Commissioner's decision is based upon proper legal standards, '[w]e will not disturb [it] if, in light of the record as a whole, it appears to be supported by substantial evidence.'") (alterations in original) (citing Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997)).

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 17] BE DENIED, the Commissioner's Motion for Summary Judgment [D.E. 18] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 10th day of July, 2023.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Beth Bloom
        Counsel of Record